EDWARDS, J.
The Statewide Guardian Ad Litem Program (“GAL”) and the Department of Children and Families (“DCF”) appeal the trial court’s Final Judgment Denying Involuntary Termination of Parental Rights and Ordering a Permanent Guardianship Case Plan (“final judgment”). The trial court denied DCF’s petition to terminate the parental rights of both A.A. (“Mother”) and A.S.A. (“Father”), despite finding that DCF had proved statutory grounds for termination as to both Mother and Father by clear and convincing evidence, and further finding that it was in the manifest best interest of the children to terminate parental rights. We reverse because the trial court erred in denying the petition based upon its conclusion that termination of parental rights was not the least restrictive means of protecting the children from harm. We agree with the trial court’s finding that this case has lingered for an unreasonable amount of time without any permanency for the children, and direct entry of an amended final judgment terminating parental rights, which makes adoption the case plan goal.
Mother has four children, H.A., J.A., A.M., and R.M. At the time DCF first initiated action, Mother was pregnant with the fourth child, R.M. Father is the biological father of the older two children, and the legal father to all four. Mother and Father are separated, but not divorced. Because J.L.M., Mother’s paramour, is not the legal father of any of the children, he is not a party to the ease. During the course of these proceeding’s, Father knowingly surrendered his parental rights.
DCF became involved with this family in March 2012 after an incident where J.L.M. physically and sexually battered Mother, who was intoxicated. H.A., who was thirteen years old at the time, attempted to intervene and J.L.M. also battered him. J.L.M. was subsequently arrested for sexual assault, domestic battery by strangulation, and cruelty towards a child. J.L.M. admitted to hitting Mother and H.A. He stated that Mother deserved the bruises *176 and that he had done nothing wrong. J.L.M. also admitted to smoking marijuana and “K-2”, as well as drinking every day to the point of intoxication. Mother decided not to press charges against J.L.M. and she did not follow up on her promise to obtain a domestic violence injunction to keep him from the home. J.L.M. remained a part of Mother’s life.
Later, DCF filed a dependency petition. Father and Mother stipulated and consented to the children’s dependency. The children were placed with their maternal great-aunt and great-uncle. They have formed a bond with them, and, by all accounts, are doing well. Mother was given a reasonable case plan, but did not complete it. Mother was inconsistent in attending family meetings, was often as late as two hours in arriving, and otherwise indicated that her children were not her first concern. She gave her children no real financial or emotional support, provided them with no guidance, and took no meaningful steps to protect them from the abusive J.L.M. Contrary to her case plan, she remained unemployed, continued to use alcohol, and repeatedly tested positive for marijuana and methamphetamines.
The case plan goal went from unification to adoption and termination of parental rights. Evidentiary TPR hearings were held over a period of several days, spread over several months. The court received testimony from case workers, relatives, and law enforcement officers documenting the history of abuse, abandonment, and neglect of the children by Mother and of the danger presented by Mother’s ongoing relationship with J.L.M. The great-aunt and great-uncle testified that they were willing to adopt the children if the parents’ rights were terminated. The older children expressed a desire to remain with their great-aunt and great-uncle. The case worker found that the children were doing well in this setting, and recommended strongly against returning the children to Mother’s care, asserting that to do so would be harmful to them.
Mother was evaluated by a psychiatrist who found that she was unable to deal with J.L.M. and would likely continue to be abused. A court-appointed psychologist diagnosed her with depression and found her unable to care for her children. Both recommended therapy; however, Mother never sought or received any.
On March 3, 2015, nearly three years after the plight of these children came to DCF’s attention, the trial court entered the final judgment. In its twenty-page final judgment, the trial court found that there was clear and convincing proof that Mother’s continued involvement in the parent-child relationship threatened the life, safety, well-being, or physical, mental, or emotional health of the children, despite DCF’s good faith efforts to offer assistance and a reasonable case plan that would have eliminated the conditions that caused the children to have been adjudicated dependent. Mother’s harmful conduct included repeated, confirmed drug use; filthy, dangerous, deplorable and uninhabitable household conditions; no income; and failure to provide emotional support and guidance to her children.
The trial court noted its deep concern for Mother’s continued relationship with J.L.M. and found that Mother failed to complete her case plan tasks, lied about her continued drug use, and was unable to show six continuous months.of sobriety. The trial court also found that Mother’s failure to substantially comply with the case plan was evidence of continuing abuse, neglect or abandonment, and further demonstrated that the children would be prospectively abused and neglected if placed with Mother. It agreed that the children’s current placement was suitable *177 and provided them with stability and support for their physical, developmental, and emotional needs. The trial court further found that reunification of the children with Mother was not in their best interest.
However, the trial court refused to terminate Mother’s parental rights, finding that there was no showing that this was the least restrictive means of protecting the children from harm. It noted that according to the psychologist, Mother would likely respond to treatment if and when she chose to seek treatment and she had made some efforts to curtail her drug use, despite the fact that she continued to use drugs and lie about it. Thus, the trial court found that it could not conclude that a less restrictive alternative “could not ameliorate the risk to the children.” Despite finding that “[t]his case has lingered for an unreasonable amount of time without any permanency for the children,” the court denied termination of parental rights and denied adoption. Instead, it ordered that permanent guardianship with the great-aunt and great-uncle would be the new case plan goal. ■
“In termination of parental rights [ ] cases, the standard of review is highly deferential.” C.D. v. Fla. Dep’t of Child. & Fams., 164 So.3d 40, 42 (Fla. 1st DCA 2015). However, an appellate court is not required to defer to the trial court where there is no theory or principle of law that would support the trial court’s conclusions of law concerning its least restrictive means findings. In re Baby E.A.W., 658 So.2d 961, 967 (Fla.1995). “An appellate court will review de novo whether the trial court’s determinations are based on a proper interpretation of the law.” G.S. v. T.B., 985 So.2d 978, 982 (Fla.2008).
“To terminate a parent’s right in a natural child, the evidence must be clear and convincing.” In re Baby E.A.W., 658 So.2d at 967. Because parental rights are a fundamental liberty interest, the state must establish that termination of those rights is the least restrictive means of protecting the child from serious harm. Padgett v. Dep’t of HRS, 577 So.2d 565, 571 (Fla.1991). DCF “must show that it has made a good faith effort to rehabilitate the parent and reunite the family, such as through a current performance agreement or other such plan for the present child.” Id.
Here, the trial court’s denial of termination incorrectly suggests that the least restrictive means test cannot be met if there are any available' alternatives. We have previously rejected such an interpretation. Dep’t of Child. & Fams. v. B.B., 824 So.2d 1000 (Fla. 5th DCA 2002). “The ‘least restrictive means’ test simply requires that measures short of termination should be utilized if such measures can permit the safe re-establishment of the parent-child bond.” Id. It is unreasonable to prevent the children from being adopted if reunification with the parent is impossible and it is otherwise in the children’s best interests, even if evidence shows that limited and supervised contact between the parent and children would not be harmful. Emphasis on whether any parent-child contact is possible misconstrues the Florida Supreme Court’s rationale for the least restrictive means test.
The availability of a safe and stable relative placement does not negate proof of least restrictive means, and availability of a nonadoptive relative placement may not receive greater consideration than any other factor weighing on the manifest best interest of the child and may not be considered as a factor weighing against termination of parental rights. § 39.810(1), Fla. Stat. (2014); A.J. v. K.A.O., 951 So.2d 30, 33 (Fla. 5th DCA 2007) (“[T]he existence of a long-term relative placement is not the dispositive constitutional consideration *178 in applying the least restrictive means test. Nor is the least restrictive means test intended to preserve the parental bonds at the cost of a child’s future.”).
In addition to misapplying the least restrictive means test, the trial court also erred by placing the children in a permanent guardianship under the facts of this case. Generally, a court should not consider permanent guardianship as a permanency option unless the court first “determines that reunification or adoption is not in the. best interest of the child.... ” § 39.6221(1), Fla. Stat. (2014). Section 39.621(2)(a)-(e) lists permanency options for dependent children in order of legislative preference. The statute specifies that adoption is the first option to be used after reunification. However, given the variety of situations that may exist in these cases, “[i]f a court determines that reunification or adoption is not in the best interest of the child, the court may place the child in a permanent guardianship.... ” § 39.6221(1), Fla. Stat. (2014).
One of the purposes of Chapter 39, Florida Statutes, is to ensure that permanent placement with the biological or adoptive family is achieved as soon as possible for every child. See § 39.001(l)(h), Fla. Stat.' (2014). Section 39.621(1) also notes that “[t]ime is of the essence for permanency of children in the dependency system.” Adoption is preferred over guardianship because guardianship requires continuing judicial involvement, whereas adoption is as equally extensive and permanent as the rights of natural children, and provides a child with support, privacy, and inheritance. G.S. v. T.B., 985 So.2d at 984.
Here, DCF’s case plan specified adoption as its permanency goal. The parties neither requested nor does the evidence support a permanent guardianship. In this case, the grounds for termination were proven, and it was in the best interest of the children to be adopted. Under the trial court’s rationale, permanent placement with a fit and willing relative could be considered if it preserved a bond and the child was out of harm’s way.
The trial court erred by shifting its focus away from the children’s best interests and onto the interests of Mother. The evidence from trial clearly demonstrated that the great-aunt and great-uncle wanted to adopt the children, and it was in the children’s best interests to be adopted. The trial court’s denial of the petition and change of case plan goal to permanent guardianship denied the children the permanency and stability of adoption. Doing so under the circumstances of this case prioritized tenuous parental contact over the children’s right to permanency, in direct conflict with section 39.621.
Additionally, we find that the trial court erred by holding that it was unable to terminate Mother’s parental rights because single parent termination is not permitted pursuant to section 39.811(6), Florida Statutes (2014). In the final judgment, the trial court noted and accepted Father’s voluntary surrender of parental rights. Father’s surrender of his parental rights is grounds for termination. See § 39.806(l)(a), Fla. Stat. (2014). Thus, there was no single parent termination of parental rights.
For the reasons discussed above, we reverse the trial court’s refusal to terminate parental rights and remand for entry of an amended final judgment terminating Mother and Father’s parental rights that also establishes adoption as the case plan goal.
REVERSED and REMANDED.
PALMER and EVANDER, JJ., concur.